Rob Bonta
Attorney General of California
Christopher H. Findley
Supervising Deputy Attorney General
Laura Macfarlane
Deputy Attorney General
State Bar No. 301284
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone: (619) 738-9147
  Fax: (916) 732-7920
  E-mail: Laura.Macfarlane@doj.ca.gov
*Attorneys for Defendants*
*D. Emanuel and M. Nieves*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **MARCUS ALLEN HOLMES,** | 2:24-cv-10845-SVW-SK |
| Plaintiff, | **DECLARATION OF R. CANNING, PH.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **D. EMANUEL, et al.,** | |
| Defendants. | |

I, R. Canning, Ph.D., declare as follows:

1.      I am not a party to this case. I am competent to testify to the matters set forth in this declaration and, if called upon to do so, I would and could so testify. I submit this declaration in support of Defendant's Motion for Summary Judgment.

2.      I am a licensed clinical psychologist in the State of California. I received my PhD in clinical psychology from Palo Alto University (formerly Pacific Graduate School of Psychology) in June 1993; completed a clinical internship at the University of Pittsburgh Medical Center; and a post-graduate fellowship in psychiatric epidemiology from 1993 to 1995. I have been licensed by

the State of California since February 1997. Between 1995 and 2001, I was a clinical psychologist for the Veterans Administration and then the University of California Davis Medical Center Department of Psychiatry. A current curriculum vitae is attached to this declaration as an **Exhibit A.**

3.      From August 2001 through August 2025, I was employed by the California Department of Corrections and Rehabilitation (CDCR).[1] From 2001 to 2005, I performed mental health clinical duties at the California Medical Facility in Vacaville, CA. In September 2005, I accepted a position as senior psychologist at the CDCR statewide mental health program in Sacramento. In that position I was the chair of the department's suicide prevention committee. I also participated in a wide variety of mental health policy discussions and the implementation of those policies. I have a broad and detailed knowledge of CDCR's mental health policies and procedures regarding outpatient and inpatient treatment of mental health problems. In addition, in 2013 and 2015 I was a supervising psychologist at several institutions supervising the day-to-day work of mental health clinicians. From 2016 through 2018, I was part of a team that designed and then deployed the Department's electronic medical record system. From February 2020 through August 2025, I was a senior psychologist with the mental health program's suicide prevention, quality management, and mental health informatics programs.

4.      Outside of my employment by CDCR, I have acted as an expert for attorneys and jurisdictions regarding suicide prevention and the delivery of mental health services in custodial settings. I have been a named expert for both plaintiffs and defendants in wrongful death litigation. I am currently a subject matter expert for the court-appointed monitor in the U.S. DOJ's CRIPA litigation with the Los Angeles County Sheriff's department in *United States v. County of Los Angeles*,

---

[1] At the end of 2018 I formally retired from state service but returned in February 2020 as a "Retired Annuitant," a classification used by the state to allow retired employees with special expertise to work part-time in their previous position.

2:15-cv-05903 (C.D. Cal.). In that role I work with the monitor and other experts to review clinical care, make site visits to the jail facilities, and participate in periodic reports to the federal district court.

5.      I have been a National Commission on Correctional Health Care Certified Correctional Health Professional since 2016. I have co-authored publications regarding suicide prevention in custodial settings and the delivery of mental health services in those settings. I served as an instructor on suicide risk assessment for mental health clinicians for the American Association of Suicidology from 2007 through 2024.

6.      I am familiar with the standard of care and skill ordinarily exercised by reputable members of the psychology professions providing mental health care in prison settings.  I am also familiar with the practices, policies, and procedures promulgated by the California Department of Corrections and Rehabilitation (CDCR) and CCHCS regarding delivery of mental health care to individuals incarcerated in CDCR prisons.

7.      Since 2017, CDCR incarcerated individuals' medical records, including mental health records, have been produced and stored in an electronic system called the Electronic Health Record System (EHRS). Medical records, including mental health records, are maintained for each individual in the custody of CDCR.  These records contain information to identify the individual, describe the individual's treatment or care, and provide for continuity of care.  The EHRS contains all an individual's medical records while in the custody of CDCR and are accessible by authorized personnel.  The records contained in the EHRS are maintained in the regular course of CDCR business by employees as part of their employment and duties.  Entries are made based on the personal knowledge and experience of the individual medical and mental health professionals at or near the time of their observation, diagnosis, and treatment of the inmate's conditions.  As a senior psychologist in CCHCS, I had access to EHRS records and reviewed such

records as a regular part of my work.  As a retired annuitant psychologist, I continued to have access to UHR and EHRS records. After leaving state service at the end of August 2025 I was provided with copies of the plaintiff's medical records by counsel.

8.      The mental health care delivery system in the CDCR is based on the *Coleman* court-approved policies and procedures contained in the department's Mental Health Services Delivery System (MHSDS) Program Guide, most recently updated in 2021.[2] This document delineates care guidelines for patients at all levels of custody in CDCR. Specifically, mental health services delivery is based on "levels of care" (LOC) assigned through screening and evaluation by mental health clinicians. These LOCs denote the acuity of an incarcerated individual's mental health needs and ability to function in a correctional environment. The lowest (i.e. least acute) LOC is the Correctional Clinical Case Management System (CCCMS) which exists in almost all CDCR institutions. For patients with higher levels of acuity and chronic mental health problems or those suffering from mental health crises, the Enhanced Outpatient Program (EOP) LOC provides more intensive individual and group treatment in protected housing units. For patients in need of inpatient psychiatric treatment, the department has short-term and longer-term inpatient facilities. The Mental Health Crisis Bed (MHCB) LOC provides crisis stabilization and treatment in licensed hospital units for up to ten days, while the Acute Inpatient (Acute), and Intermediate Care (ICF) LOCs treat patients for up to six months in licensed psychiatric hospital settings. The MHSDS is designed to provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and

---

[2] *Coleman v. Newsom* (2:90-cv-520) is a longstanding class action in the District Court for the Eastern District of California providing for constitutionally adequate mental health services for all seriously mentally ill inmates in CDCR. The MHSDS Program Guide (2021 Revision) is the approved remedy and prescribes the delivery of mental health services to the class.  The Program Guide may be accessed online at https://cchcs.ca.gov/wp-content/uploads/sites/60/2021-Program-Guide-2.1.22.pdf.

1    security needs of both the inmate-patient and the institution.

2        9.        Twenty-one of the 31 CDCR prisons have EOP treatment units. The

3    EOP level of care provides the most intensive level of outpatient mental health care

4    in the CDCR. The program is characterized by a separate housing unit and

5    structured activities for mentally ill individuals, who because of their mental health

6    problems cannot function well in the general population setting yet are not so

7    impaired as to require inpatient psychiatric care. EOP patients receive weekly

8    sessions with a mental health clinician, once-monthly psychiatric sessions, and are

9    offered a minimum of ten hours of structured group treatment. In addition,

10    treatment planning is scheduled to occur at least every ninety days and is

11    coordinated by an interdisciplinary treatment team (IDTT) composed of

12    representatives of medical services, custodial staff, and mental health staff.

13        10.        MHCB units are distributed throughout the CDCR system. Each unit is

14    licensed by the State of California to provide 24-hour intensive nursing care. They

15    are staffed by custodial, medical, nursing, psychiatric, and mental health personnel.

16    Patients admitted to MHCB units are provided daily confidential mental health

17    contacts, treatment team meetings, and psychiatrist visits at least twice weekly. The

18    target population for MHCB admission are those CDCR residents who because of

19    mental health conditions cannot function in their current environment. Examples of

20    such patients are those suffering from acute suicidal crises, are a danger to others,

21    or because of a mental disorder are gravely disabled. The units provide round-the-

22    clock monitoring of patients and in the case of actively suicidal patients, continuous

23    visual observation. The typical length of stay for patient in MHCBs is ten days

24    although this varies by the treatment needs of the patient. Discharge planning

25    commences at the initial treatment planning session and is gauged by the patient's

26    response to treatment. Interdisciplinary treatment team (IDTT) meetings occur

27    within three days of a patient's arrival and then weekly. Patients can be discharged

28    to their originating prison program or referred to the most appropriate placement.

1    Patients who are not stabilized during their MHCB stay can be referred to the Acute

2    level of care, a longer-term inpatient program within CDCR.

3         11.    I have accessed the medical and mental records of Mr. Holmes kept in

4    the ordinary course of business, stored electronically, which were available to me in

5    my position with CCHCS and later provided by Defendants' counsel. My opinions

6    are subject to modification or augmentation at a later date should additional

7    documents be made available for my review. In preparation for this declaration, I

8    reviewed a number of documents:

9              a. Plaintiff's Complaint.

10             b. CDCR electronic health care records for March 4, 2024, through

11                August 16, 2024.

12             c. Movement records for Mr. Holmes as reported by the mental health

13                program's quality management reporting system.

14             d. Self-harm tracking records for Mr. Holmes from March 4, 2024,

15                through August 16, 2024 as reported by the department's suicide

16                prevention reporting system.

17             e. Disciplinary reports contained in the CDCR Strategic Offender

18                Management System (SOMS), a computerized database containing

19                housing, classification, and movement information about incarcerated

20                individuals.

21             f. Classification hearing records of the August 14, 2024, hearing

22                contained in SOMS.

23             g. CDCR MHSDS Program Guide (2021 Revision) - Chapter 4: EOP and

24                Chapter 5: MHCB.

25        12.    Mr. Holmes has been continuously in CDCR custody since October

26    27, 2021. Aside from two months in a reception center, and eight months at

27    California State Prison Sacramento (SAC) in 2023, Mr. Holmes was housed at

28    California State Prison Los Angeles (LAC) prior to his transfer to the Substance

Abuse and Treatment Facility on August 17, 2024. From his entry into CDCR in 2021 until he was discharged to CCCMS LOC in July 2024, his mental health LOC was consistently EOP with two admissions to MHCB units totaling 18 days.

13.     Diagnostically, clinicians described Mr. Holmes as, at times, suffering from anxiety, post-trauma symptoms associated with a stabbing incident in March, 2023, and an antisocial personality disorder.[3] An antisocial personality disorder, a common psychiatric diagnosis among incarcerated individuals, is characterized by selfish, irresponsible, reckless, and impulsive behavior that shows a lack of regard for the rights of others. Individuals with antisocial personality disorder find it easy to lie if it serves their purpose. Physical aggression can be common. In correctional settings individuals suffering from an antisocial personality disorder can seek to manipulate their environment to obtain preferred treatment and less harsh living conditions. But even in these situations they can continue to encounter problems with the correctional authority and with medical and mental health staff. They can be confrontational, abusive, and demanding with staff. They can exaggerate mental health symptoms and make threats of suicide or self-harm to favorably manipulate their situation. Additionally, as incarcerated individuals who are embedded in the legal system, they may resort to administrative procedures and litigation to obtain what they perceive is their due.

14.     Mr. Holmes had an extensive history of documented rules violations while in CDCR custody and prior to April 2024. During this period he accrued 26

---

[3] Personality disorder is a psychiatric diagnosis characterized by a pervasive pattern of personal dysfunction in most areas of interpersonal, social, occupational, and emotional functioning. It is a long-lasting, inflexible, and pervasive pattern of inner experience and behavior that deviates significantly from the expectations of the individual's culture, leading to significant distress or impairment in social, occupational, or other important areas of functioning. This pattern typically manifests in a person's way of thinking, emotional responses, interpersonal functioning, and impulse control. For instance, a person may have difficulties getting along with romantic partners, bank tellers, clerks in stores, teachers, or fellow employees. These disruptions can result in poor job performance, interrupted and multiple romantic relationships, poor family relations, and difficulties with authority, particularly the police and while in detention, correctional staff.

"serious" disciplinary violations. These included theft of inmate property, battery on a peace officer or prisoner (x3), fighting (x9), possession of a deadly weapon, false report of a crime, resisting or delaying a peace officer's duty (x8), or behavior that could lead to violence (x3). Serious violations often result in stays in restricted housing settings. During his time at LAC prior to April 2024, Mr. Holmes spent 123 days in restricted housing due to disciplinary infractions.[4]

15.     In my professional experience working with incarcerated individuals and observing correctional settings, it is not uncommon for antisocial individuals such as Mr. Holmes to claim that they are suicidal in order to be seen by a mental health professional and possibly get a change of housing if only for a matter of hours. CDCR's mental health policies require that if an incarcerated individual shows signs of suicidality, they are to be placed in a temporary housing situation called "Alternative Housing" where they are under continuous visual observation and then evaluated by a mental health professional.[5] Once an evaluation is completed and a determination is reached that the person does or does not need a higher level of care, the individual is either admitted to an MHCB unit or returned to their original housing. In Mr. Holmes' case, he was moved to Alternative Housing for evaluation in 29 times between December 2021 and April 2024. During the period April 9, 2024 through July 2, 2024, while housed at LAC, Mr. Holmes was placed on Alternative Housing six times for making suicidal statements. In each instance he was deemed to not require a higher level of mental health care but was using suicidal language to control his housing placement and to make unwarranted demands of mental health staff.

16.     In October 2023 while housed at SAC, Mr. Holmes completed his

---

[4] It should be noted that Mr. Holmes' transfer to SAC in August 2023 was for the continuation of a restricted housing term that started in May 2023. While at SAC he was housed for 55 days in a treatment setting for individuals with restricted housing terms.

[5] The maximum time an individual can be housed in Alternative Housing is 24 hours due to the requirement that once an individual is deemed to need MHCB level of care they must be transferred within 24 hours.

restricted housing unit term and was released to a general population yard. On March 3, 2024, he was stabbed in the shoulder by another inmate and immediately rehoused in the restricted housing unit for his safety and until a determination could be made as to where he could be safely housed.

17.    On March 4, 2024, while housed at SAC he was interviewed by a mental health clinician who wrote in her clinical documentation that he immediately asked her: "So, what kind of a clinician are you? What can I expect from you?" She noted that "[t]he interaction was [like] a job interview whereby it soon became clear that [Mr. Holmes] was looking for a [clinician] that would advocate for single-cell status." Seen by the same clinician the next day he was noted to be argumentative and defensive before being open to communication. On March 12, 2024, the clinical summary from a mental health team meeting with Mr. Holmes present noted that he "endorsed the belief that one must make a disturbance to get anything done. … [He] appears to anticipate conflict and accept it as a foregone conclusion, thereby justifying maladaptive behavior such as self-harm to get [his] needs met. … 'I don't expect [mental health] clinicians to help me, I help myself'".

18.    On April 9, 2024, Mr. Holmes was returned to LAC where his mental health level of care was maintained at EOP and he was housed on the general population EOP yard. As per MHSDS policy he was assigned a psychiatrist and mental health primary clinician who both conducted intake interviews, and was scheduled for an initial treatment team meeting.

19.    The psychiatrist, Dr. Turner, interviewed him on April 16, 2024, and to be "initially challenging and defensive with [the psychiatrist]; then cooperative and says 'I like you, thinking and discussing things.' … [he] then mentioned he thinks [he] will be ready for CCCMS soon … thinks CCCMS allows him more vocational things. … Mentions ongoing complaint/court about LAC officer; [he] says his PTSD is 'acting up.'"

20.     In an intake interview with his assigned primary clinician, Ms. Nieves, on April 19, 2024, Mr. Holmes reported "paranoia" from the stabbing incident at SAC and that he "may benefit from working on his anger and emotional regulation."

21.     A mental health treatment team entry from April 22, 2024, notes that he had a record of not attending treatment groups while at the EOP level of care. In conversation with team members he responded that he had not received the required appointment notices for his groups. The team judged that at least some of his refusal to attend groups was a lack of insight into his mental disorder. They noted that he was functioning well in the EOP general population environment and made a goal for Mr. Holmes to increase his group attendance. They planned on offering him six groups per week for 40 days. The team documentation states that he had no obvious distress and appeared to be functioning at "baseline." Finally, given his overall adequate functioning and a lack of overt distress due to his mental illness, the team discussed a possible discharge to the CCCMS level of care in 90 days, at Mr. Holmes' next scheduled treatment team meeting.

22.     On April 25, 2024, Ms. Nieves attempted to contact Mr. Holmes while he was out of his housing on the yard. This means of contact was due to a custody "modified program" which limited confidential meetings with clinical staff. Although custody staff called out to Mr. Holmes six times, he appeared to ignore the calls for his attention, and Ms. Nieves marked this contact as a refusal.

23.     On May 2, 2024, Ms. Nieves went to see Mr. Holmes at his cell after he did not attend his scheduled appointment in the EOP treatment center building. In her documentation of the encounter she noted that he denied "any new issues or concerns. … [he] did not appear in acute distress. … He was hostile and minimally cooperative with [his clinician]. … [and] appeared more focus[ed] on discussing custodial issues than his [mental health symptoms]." She gave him a copy of the group schedule for his unit and noted that he stated he wanted to stay in EOP "…

10

but wants [Ms. Nieves] to understand that he does not [participate in groups] due to him being in EOP for a while citing 'you can tell me all about the expectations as you please but ive [*sic*] been here a long time and I been did all that group shit, so I don't need you or a prison telling me I got to go sit in a group at almost 37 years old, its not happening.'" She states in her clinical note that "[he] then proceeded to [border] on overfamiliarity with [the clinician]."[6] Ms. Nieves closes the note by stating that she attempted to correct his misconduct and then ended the interview.

24.     On May 7 and May 8, 2024, Mr. Holmes attended two recreation groups focused on physical activity - basketball.

25.     On May 9, 2024, Ms. Nieves interviewed Mr. Holmes at his cell due to the cancellation of his "caseload" group.[7] After conducting a short interview with Mr. Holmes' cellmate, Ms. Nieves attempted to interview Mr. Holmes. She describes his demeanor as angry and his tone as "intense." She reported that he shouted at her and demanded to be seen out of his cell. As she explained the reason for the cell-front visits he stated: "No you and these bull shit ass officers is against me thinking I'm stupid, I feel like yall [*sic*] playing with me." Ms. Nieves explored possible ways that Mr. Holmes could get more support but, she wrote: "[He] became irate citing 'I don't care if I make you feel uncomfortable I'm not that, these guys look at you like a piece of meat.'" She utilized clinical skills to try and calm Mr. Holmes but he "continued to yell obscenities" at her. She persisted in efforts to de-escalate the situation, to no avail. She informed Mr. Holmes that she would be reporting his behavior as a rules violation. As she departed the area of his cell he continued to yell obscenities at her even as she was on the other side of the building.

---

[6] Overfamiliarity in the correctional mental health context may include flirtatious or sexualized or abusive verbal behavior toward a female staff or other behavior that is beyond the bounds of a professional clinical encounter.
[7] "Caseload" groups allow mental health clinicians to see all patients on their caseload in a confidential setting, thus fulfilling the EOP requirement of weekly clinician visits.

26.    On the same day, and soon after the cell-front interview with Ms. Nieves, Mr. Holmes apparently superficially cut himself on his right wrist. He was seen by nursing who dressed the small wound and was subsequently referred for an emergent mental health evaluation for possible need for a higher level of care.

27.    The mental health clinician who evaluated him noted that he was difficult to re-direct and would not de-escalate. He used suicidal language and stated he wanted to be placed on suicide watch overnight because he did not want to return to his original housing. He was adamant that he would participate in mental health treatment only so long as he was assigned a new primary clinician. The clinician noted that he denied any personal safety issues, was future oriented and did not present with any suicidal intent and had "vague threats." He rated his Acute suicide risk as low and his Chronic risk as high.

28.    On the morning of May 10, 2024, after having spent the night on Alternative Housing status, he proclaimed to a clinician that he was "ready to go back." The clinical evaluation found that he no longer needed a higher level of mental health care and he was accompanied back to his original housing.

29.    Between May 11 and May 15, 2024, a "Five-day Follow-up" procedure was completed. This clinical procedure is completed any time an incarcerated individual is evaluated for suicidality and returned to their housing without admission to a higher level of care. An inmate is evaluated by a clinician daily for the five-day period. In the case of Mr. Holmes, the five-day follow-up was completed with no significant findings or changes noted.

30.    On May 15, 2024, Mr. Holmes was seen by his assigned psychiatrist, Dr. Turner, for his regular monthly psychiatric assessment. Mr. Holmes had not attended a scheduled office visit and was thus seen for a brief interview at his cell. Mr. Holmes explained that he did not like waiting to be seen and had left after finding out that Dr. Turner was with another patient. Dr. Turner noted the recent overnight stay in Alternative Housing and Mr. Holmes' use of suicidal language -

suggesting that staff believe it may have been motivated by a desire to be out of his housing overnight. The psychiatrist's documentation noted that Mr. Holmes showed no significant distress, suicidal ideation, or major signs/symptoms of mental health problems other than some anxiety, which he attributed to his post-trauma syndrome.

31.     Late in the evening of May 16, 2024, Mr. Holmes told a staff member that "there is no reason for me to live." He was removed from his cell and placed in Alternative Housing. A mental health clinician evaluated his suicide risk the next morning and found him in no acute distress and denying current suicidal planning, intent, or preparation. He told the clinician that he was unhappy with his assigned clinician's approach, that he wanted more family contact. There was no overt precipitating factor for his statement. The clinician wrote that "[o]verall [Mr. Holmes'] participation was selective and aimed at addressing environmental factors and there was no indication of thoughts of death, no hopelessness, no ambivalence about his life… ." The clinician determined that he no longer needed a higher level of mental health care and he was returned to his housing. His Acute suicide risk was rated as Low and his Chronic risk as High.

32.     A five-day follow-up procedure was completed from May 18 through May 22, 2024 with no significant changes or findings.

33.     On May 30, 2024, as Ms. Nieves was completing a cell-front interview with Mr. Holmes' cellmate, Mr. Holmes yelled out for her to "get away from my door, you not about to talk to him at my door, he good." Ms. Nieves notes that Mr. Holmes' pattern of behavior when staff were talking to his cellmate (including a similar incident with his psychiatrist Dr. Turner) could interfere with the mental health care of his cellmate. She reported this incident to custodial housing staff.

34.     On May 31, 2024, at approximately 2140 hours, Mr. Holmes was again placed on Alternative Housing status. He was evaluated the next day by a clinician who wrote that "[Holmes] reported he needed a break for his current

cellmate and admitted that he sought [Alternative Housing] to process recent grief and irritability secondary mood states. [Mr. Holmes'] records indicate inappropriate [behavior] with clinical staff, in that [he] was noted to be preventing his current assigned cellmate from having access to care by interrupting and being disrespectful to his [cellmate's clinician] when she would come to the cell front and turn her away. [Mr. Holmes] mentioned this in passing, stating that the [Sergeant] attempted to rehouse his cellmate but [he] became angered by this because while he does not want a cell mate, if he has to have one, he prefers the current cellmate. [Mr. Holmes] was able to demonstrate insight into the inappropriate nature of his [behaviors] and that there are multiple alternative interventions [he] could have utilized to address his [mental health] concerns and housing concerns rather than report of [suicidal ideation] when [suicidal ideation] not present." Reflecting on the change of primary clinician from Ms. Nieves to Dr. Emanuel, Mr. Holmes reportedly stated to the clinician: "I got Dr. Emanuel as my clinician and I think it is a good fit, I'm doing better with my treatment." The clinician rated his Acute suicide risk as Low and his Chronic risk as High. The clinician found that he no longer required a higher level of mental health care and he was returned to his regular housing unit.

35.    From June 2 through June 5, 2024, a five-day follow-up procedure was completed with no significant changes or findings. On June 4, 2024, as part of the five-day follow-up safety planning process Dr. Emanuel wrote that Mr. Holmes is "… motivated to remain in [the treatment] program, has notable issues with [level of care changes] and noted to be reactive to environmental changes. Poor accountability at times and can be argumentative and disruptive when perceived needs not met."

36.    A few minutes after midnight on June 6, 2024, Mr. Holmes was placed on Alternative Housing status and moved out of his cell. Later in the same day a clinician evaluated his suicide risk and wrote that he could find no current suicidal

intent, planning, or preparation. The clinician noted that Mr. Holmes apparently wanted to be in Alternative Housing to have some time alone. He wrote that Mr. Holmes "plans to continue to utilize suicidal language to affect his housing in the future and get some out of cell time. [He] seems to have knowledge and sufficient understanding of resources and support in his current [level of care] and housing unit. … [and is] willing to work with mental health providers whom he perceives are genuinely there to help him. [Mr. Holmes] seems to [have] the ability to advocate for his needs … [and] also recognizes effective coping strategies that he can utilize to decrease stressors." The clinician found that Mr. Holmes no longer required a higher level of mental health care. Mr. Holmes' Acute suicide risk was rated as low and his Chronic risk as high. He was subsequently returned to his original housing.

37.     From June 7 through June 11, 2024, a five-day follow-up procedure was completed with no changes or significant findings. It is noteworthy that on at least two of the five-day follow-up contacts, Mr. Holmes expressed the idea that his use suicidal language was "secondary to get out of cell time."

38.     On June 13, 2024, Mr. Holmes was scheduled for a confidential appointment with Dr. Turner. When he did not show up for the appointment, Dr. Turner interviewed him at his cell. In his clinical documentation, Dr. Turner wrote that "since [his] last [appointment], has had 3 [suicide risk evaluations] for [suicidal ideation] and [after] all 3 he was returned to housing, as [he] later denied [suicidal ideation] and reported [his] reason was to get access to [an electronic] tablet, [a] break from cellmate, get out of cell. [I]t is also noted how [the patient] has been interfering with cellmate's mental health care. [C]ontinue discussing with IDTT team appropriateness for [his level of care]."

39.     On June 14, 2024 in response to a request for an emergency mental health consultation Mr. Holmes told a social worker that he wanted to be housed alone stating: "I'm telling this is my third term and I am tired of this shit. I want my

own cell. If you put someone in her I will hurt them." The social worker explained the process to advocate for being housed alone with his treatment team. The social worker documented that Mr. Holmes was "not receptive stating 'I'm telling you what to document bitch.'"

40.    Later on June 17, 2024, Dr. Emanuel interviewed Mr. Holmes at his cell due to the limited availability of mental health staff that day. Dr. Emanuel noted that Mr. Holmes' demeanor was calm and his thinking appeared coherent and logical. He noted that Mr. Holmes "expressed willingness to attend his weekly treatment groups and attend his next [one-to-one] clinical encounter." Dr. Emanuel wrote that "At the time of contact, there was no objective evidence to suggest that [Mr. Holmes] was experiencing a decline in his mental health condition."

41.    Late in the afternoon of June 28, 2024, while in the gym, Mr. Holmes, told a psychiatric technician that he was suicidal. He was placed on Alternative Housing status and a mental health evaluation was ordered. The evaluation was completed on the morning of June 29th by a mental health clinician who noted in the documentation of the encounter that Mr. Holmes was using suicidal language to manipulate his housing. Additionally, the clinician wrote that he believed that Mr. Holmes was "…appropriately placed in EOP [level of care] where he may continue to work with [his primary clinician] … vs misuse of the MH delivery system." He was found to no longer need a higher level of mental health care and was returned to his original housing. The clinician judged Mr. Holmes' Acute suicide risk as low and his Chronic risk as high.

42.    During his 16 hours on Alternative Housing status on June 29th and 30th, 2024, Mr. Holmes committed two acts of indecent exposure for which he received disciplinary reports. When evaluated later by clinicians about these two incidents, the clinicians interviewed him as part of the CDCR disciplinary process found that his mental health symptoms did not contribute to the alleged misconduct.

43.    On July 1, 2024, Mr. Holmes was interviewed by Dr. Emanuel as

preparation for the upcoming review of his treatment and evaluation of his level of care by the EOP treatment team. Dr. Emanuel reviewed Mr. Holmes' treatment history at LAC and other institutions, noting his multiple claims of suicidality and his admission that he used suicidal language to change his housing situation or be taken away from his cell for a period. Dr. Emanuel noted that as recent as the day before (June 30, 2024) Mr. Holmes had stated: "I'm going to be honest with you I'm just trying to get single cell status. I'm tired of adjusting to new [cellmates]." Dr. Emanuel wrote that Mr. Holmes told a clinician on June 29, 2024 that he wanted to remain on the 'C' yard where he was currently being housed on Alternative Housing status and that if released back to his original housing ('D' yard) he would simply use suicidal language to be returned to Alternative Housing status on 'C' yard. Dr. Emanuel noted that the EOP level of care appeared appropriate given Mr. Holmes' "… lack of understanding of his [mental health symptoms] that drives his high [treatment] refusal." He also noted that the upcoming team meeting will review his "… readiness for transition … to a lower [level of care]."

44.     On July 2, 2024, the EOP treatment team met with Mr. Holmes for a review of his progress, treatment plan, and evaluation of his current level of care. The documentation of the team discussion noted Mr. Holmes' poor participation in therapeutic groups (less than 50% of groups offered), his poor medication adherence, and his sporadic attendance at scheduled confidential visits with both clinicians and psychiatry. They noted that he was able to function adequately in his housing unit and did not "… present with any significant mental health issues." Separate comments by the psychiatrist present noted that Mr. Holmes said that he takes his medication "… when I need to." And that he would take it "as needed." The psychiatrist emphasized that the medication does not work if taken only intermittently. The team declared that Mr. Holmes appeared to have reached the maximum benefit from treatment at the EOP level of care and there were no

barriers to prevent him from being discharged to a lower level of care, i.e. CCCMS. The team changed his level of care to CCCMS.

45.     Later on July 2, 2024, Mr. Holmes made a "superficial laceration to the right inside of [his] wrist." He was evaluated emergently by a mental health clinician who wrote that Mr. Holmes had no suicidal intent or plan and made future-oriented comments such as "I'm going to [grieve] …" the change to CCCMS and "… I am going to court." The clinician noted that Mr. Holmes "appeared to be fixated regarding his change to CCCMS from EOP stating 'who are they to determine what I need.'" Holmes also stated, "I need to go to [Intermediate Treatment Program] because EOP isn't working …" and "…if you guys want to play this game I can play too. I am going to court." He stated that he felt he was being retaliated against and that he needed a higher level of care than EOP because "he would like to attend more groups and 1:1 sessions." He was deemed to not require a higher level of mental health care. His Acute suicide risk was judged to be low and his Chronic risk high.

46.     Also on July 2, 2024, Mr. Holmes sent a message to *Coleman* plaintiffs' counsel asking for their assistance.[8] Plaintiffs' counsel contacted CDCR mental health quarters staff who facilitated a clinical interview with Mr. Holmes that same day.

47.     Mr. Holmes had similar incidents of self-harm on July 3, July 4, and July 5, 2024. After each incident he was evaluated by mental health staff who determined that his Acute suicide risk was low and he was returned to his housing. Five-day follow-up procedures were completed with no significant findings or change in his mental health status.

48.     On July 5, 2024, Mr. Holmes was interviewed at his cell by a

---

[8] The *Coleman* plaintiff's attorneys have for years maintained access to class members who contact them reporting significant mental distress - most frequently suicidal ideation. When contacted by incarcerated individuals in CDCR, plaintiffs' counsel reaches out to mental health staff at the CDCR headquarters asking their assistance to have individuals seen by local mental health staff.

psychiatrist, Dr. Joseph, for a CCCMS initial assessment. The psychiatrist noted that he was "highly agitated" and complained that "… custody has retaliated through mental health … I've [contacted the] *Coleman* [plaintiffs], my family too … They took me off the EOP program … stopped my medication." The psychiatrist discussed his medication regimen and ordered a restart of antidepressant medication.

49.    Also on July 24, 2024, Mr. Holmes was evaluated for suicidal potential after behavior that purported to be a suicide attempt but was deemed inauthentic by staff after viewing video of the event. At the time he was evaluated he reported to the clinician that he was "tired and depressed." The risk evaluation reported that he "did not elaborate or provide any symptoms or details. [Holmes] then denied any [suicidal ideation] … [and stated:] 'I'm cool. Send me back to my cell.'" He subsequently reported that he wanted to be sent to the Department of State Hospitals treatment program but again did not provide any support for his request. He had also reported ingesting a quantity of unknown pills and an examination at a community hospital found no evidence of ingestion.

50.    Out of an abundance of caution he was admitted to the local MHCB on July 26, 2024 and the admission summary noted that he complained he was not receiving the necessary treatment for his condition, He reported to the clinician that "I need help ... for someone to just help, the doctors on the yard, they're not helping, I haven't been getting help ... they wasn't giving us one-on-ones … I need more one-on-ones ... I've been trying to get a tablet for educational purposes … I'm in the GED course ... custody been provoking stuff, and mental health … the inadequate programming on D-yard … Immediately my mental health went away ... the mental health program here is politicking with the system ... what I suffer from, I'm gonna need counseling when I get out, and how to utilize those tools … I'm not even getting one-on-ones … how is it that I'm not getting one-on-ones … I'm not here to get my EOP back … I'm here because the doctor sent me here for hanging myself ...

here [MHCB] is good, when you come back here or in Ad Seg there's good treatment, but the doctors on the yard don't do anything." When a psychiatrist asked about his recent disciplinaries, Mr. Holmes denied responsibility for the recent indecent exposure incidents. Mr. Holmes asked the psychiatrist, "Is there any way I can get benadryl?"

51.    It is evident from the clinical records reviewed for this case that Mr. Holmes' had significant problems dealing with the mental health staff and the delivery of his care while at LAC from April through July, 2024. His behavior was at times defiant, angry, confrontational, and manipulative. There appeared to be little change in his behavior from his time at SAC in 2023 to 2024, to the four months he spent at LAC in 2024. He did not appear to be able to form good therapeutic alliances with any clinician and as noted by several, accused them of punishing him and retaliation. His patterns of behavior at LAC are typical of individuals who suffer from antisocial personality disorder.

52.    Despite his claims to need more group treatment and one-to-one counseling he consistently refused attendance at therapeutic groups and in fact the record shows zero attendance in therapeutic group between his arrival at LAC on April 9, 2024 and July 2, 2024, when his treatment team discharged him to the CCCMS level of care. He forthrightly rejected group treatment when he told his clinician Ms. Nieves on May 2, 2024  that "… I been did all that group shit, so I don't need you or a prison telling me I got to go sit in a group at almost 37 years old, its not happening."

53.    The treatment standard set by the *Coleman* court is to "provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both the inmate-patient and the institution".[9] The restrictions of treatment within

---

[9] MHSDS Program Guide, Chapter 1 page 1 (see https://cchcs.ca.gov/wp-content/uploads/sites/60/2021-Program-Guide-2.1.22.pdf)

a correctional setting impose limits on a variety of activities not found in traditional community treatment settings; e.g., limits on visitation, movement within treatment units, and the varieties of treatment available. Professional judgments in the correctional setting must consider the safety and security needs of the correctional environment. Within this context, it is my professional opinion that staff made correct and clinically beneficial judgments throughout Mr. Holmes' time in the EOP setting at LAC and acted appropriately to achieve two goals: supporting his overall functioning without deterioration of his condition and maintaining him in the least restrictive setting to continue his mental health treatment within CDCR.

54.    Mental health staff at LAC made good faith efforts to work constructively with Mr. Holmes but these attempts were often met with blustering and angry responses. His numerous refusals of confidential appointments, group therapy, and frequent use of suicidal language is strong evidence that he was less interested in help for his mental health problems than on secondary gains such as single cell status or to manipulate his housing.

55.    During his stay at LAC Mr. Holmes rarely manifested significant symptoms of a mental health disorder. He never showed signs or symptoms of significant depression, anxiety, psychosis, or even the post-traumatic stress disorder he claimed upon first arriving. Although prescribed antidepressant medication, his compliance was inconsistent and his psychiatrists never noted any improvement in his symptoms associated with the medications. During multiple evaluations of Mr. Holmes' mental status, during routine visits or during any of his many emergency suicide risk evaluations, clinicians did not note any significant distress or mental health symptoms suggesting that Mr. Holmes suffered from a serious anxiety, psychotic, or mood disorder.

56.    Interviews with Mr. Holmes' were often conducted at his cell because of his refusal to keep appointments in the EOP treatment building. At times cell front interviews were conducted when there was a critical staff shortage or custody

modified programming at LAC. This necessitated, at times, cell front interviews rather than fully confidential appointments in treatment buildings. Cell front mental health interviews can limit confidentiality but are often necessary due to client refusal to attend appointments, security needs (e.g. lockdowns), medical emergencies, and staff shortages.

57.     In my experience working with incarcerated individuals similar to Mr. Holmes, treatment teams have great difficulty creating successful therapeutic relationships with these patients. They tend to manifest angry, help-denying behaviors that frustrate staff and at times bring up strong negative emotions. These individuals are not usually amenable to traditional psychotherapy techniques and are some of the most difficult patients to treat.

I declare under penalty of perjury under the laws of the United States and the State of Arkansas that the foregoing is true and correct. Executed this __21_ day of January, 2026 in Little Rock, Arkansas.

R. Canning Ph.D. CCHP

LA2025801071

# EXHIBIT A

# CURRICULUM VITA

## ROBERT D. CANNING, PH.D., CCHP

Address:          217 J Street                                    Updated 10/2/2025
                  Davis, CA 95616
                  (530) 400-8965
                  rdcanning@gmail.com

### EDUCATION AND TRAINING

1973          B.A., Liberal Arts, University of Delaware

1993          Ph.D., Clinical Psychology, Palo Alto University

1993          Clinical Internship (APA Accredited), Western Psychiatric Institute & Clinic, University of Pittsburgh Medical Center

1995          NIMH Post-Doctoral Fellow, Psychiatric Epidemiology, Western Psychiatric Institute & Clinic, University of Pittsburgh Medical Center

### PROFESSIONAL LICENSURE

1997 – Present  Board of Psychology, State of California: PSY 14961

### PROFESSIONAL CERTIFICATION

2016 – Present  Certified Correctional Healthcare Professional, National Commission on Correctional Healthcare, Chicago, IL

### EXPERT CONSULTATIONS

**Correctional System Monitoring**

2023 – Present  *U.S. v. County of Los Angeles et al.* (2:15-cv-05903), U.S. District Court, Central District of California. Subject matter expert for the Monitor.

**Civil Litigation**

2025          *Holmes v. Emanuel et al.* (2 :24-cv-10845), U.S. District Court, Central District of California. Retained by defendants: Case consultation, record review, and court submission.

2025          *Drake v. Kernan, et al.,* (1:17-cv-01500), U.S. District Court for the Eastern District of California. Retained by defendants: Case consultation, record review, FRE Rule 26(a)(2)(B) report preparation and submission.

2025          *Kendrid v. Yahiya, et al.* (2:23-cv-1145), U.S. District Court for the Eastern District of California. Retained by defendants: case consultation, record review, and court submission.

| | |
|---|---|
| 2024 | *Adkins v. Kernan et al.* (2:19-cv-00458), U.S. District Court for the Eastern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2024 | *Mahwinney v. County of Pueblo et al.* (1:23-cv-02772), U.S. District Court, District of Colorado. Retained by plaintiffs: case consultation, record review, and Rule 26(a)(2)(B) report preparation. |
| 2024 | *Rice v. Callis* (3:22-cv-06130) U.S. District Court, Northern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2024 | *Andrews v. Rauner et al.* (1:18-cv-01101) U.S. District Court, Central District of Illinois. Retained by defendants: case consultation and record review. |
| 2023 | *Moore v. Salinas Valley State Prison, et al.* (5:21-cv-01019), U.S. District Court, Northern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2023 | *Touloudjian v. Gastelo* (2:20-cv-00520), U.S. District Court, Central District of California. Non-retained expert for defendants: record review, case consultation, and court submission. |
| 2022 | *Santiago v. County of Los Angeles, et al.* (2:21-cv-07061), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation. |
| 2021 | *Beaver v. County of Butte, et al.* (2:20-cv-00279), U.S. District Court, Eastern District of California. Retained by defendants: record review and case consultation. |
| 2019 | *Moriarty v. County of San Diego, et al.* (3:17-cv-01154), U.S. District Court, Southern District of California. Retained by plaintiffs: record review, Rule 26(a)(2)(B) report submission, and deposition. |
| 2019 | *Mendez-Jimenez v. County of Sacramento, et al.* (2:18-cv-00044), U.S. District Court, Eastern District of California. Retained by defendants: record review, Rule 26(a)(2)(B) report submission, and deposition. |
| 2019 | *Lewis v. Texas Department of Criminal Justice, et al.* (4:18-cv-00311), U.S. District Court, Southern District of Texas (Houston). Retained by plaintiffs: record review and case consultation. |
| 2018 | *Sanchez v. Young County* (7:15-cv-00012), U.S. District Court, Northern District of Texas (Wichita Falls). Retained by plaintiffs: record review and consultation. |
| 2018 | *Monday v. McDonnell, et al.* (BC643290), California Superior Court, County of Los Angeles. Retained by defendants: record review, independent medical examination, report preparation, and trial testimony. |
| 2018 | *Nishimoto v. County of San Diego, et al.* (3:16-cv-01974), U.S. District Court, Southern District of California. Retained by plaintiffs: record review, Rule 26(a)(2)(B) report submission, and deposition. |

| 2016 | *Loberg et al. v. County of Los Angeles* (2:16-cv-06190), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation. |
|------|------|
| 2015 | *Medrano v. County of Los Angeles* (2:13-cv-06664), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation. |
| 2015 | *Guenther v. County of Los Angeles* (BC543601), California Superior Court, County of Los Angeles. Retained by defendants: record review and case consultation. |

**Evaluation for Dangerousness**

| 2019 | *In the Matter of Darin Jay Petty* (16F01289), California Superior Court, County of Butte, California Welfare & Institutions Code §5008(h)(1)(B) (*Murphy* Conservatorship): Retained by Public Guardian: record review, report preparation and submission. |
|------|------|
| 2019 | *In the Matter of Brian Michael Bell* (17CF02452/17CM01778), California Superior Court, County of Butte, California Welfare & Institutions Code §5008(h)(1)(B) (*Murphy* Conservatorship): Retained by Public Guardian: record review, report preparation and submission. |
| 2015 | *In the Matter of Keith Edward Donche* (FELJS1402505), California Superior Court, County of San Bernardino. California Penal Code §1026.5. Retained by County: evaluation of dangerousness, report submission, and trial testimony. |

**Programmatic Consultations**

| 2023 | Department of Correction, New York City (*Nunez v. NYC,* 1:11-cv-05845) Review and recommendations re. suicide prevention policies and procedures. |
|------|------|
| 2020 – 2022 | Correctional Health Services, Department of Health Services, Los Angeles County. Training for clinical staff in suicide risk assessment and consultation re. suicide prevention practices in the jails. |
| 2019 – 2021 | Jail Mental Health Team, Behavioral Health and Recovery Services, Department of Health & Human Services, County of Marin, San Rafael, CA. Review and recommendations re. suicide prevention policies. |
| 2019 | Behavioral Health Team, Juvenile Detention Facility, Yolo County Probation Department, Woodland, CA. Clinical consultation and training re. suicide risk assessment with justice-involved youth. |
| 2018 | Disability Rights of California, San Diego Jail Suicides Project, Berkeley, CA. Expert consultation and case reviews of in-custody suicides in San Diego Jails. https://www.disabilityrightsca.org/public-reports/san-diego-jail-suicides-report |

## POSITIONS AND APPOINTMENTS

| 2005 – 2025 | Senior Psychologist, Specialist, Statewide Mental Health Program, California Correctional Health Care Services, Elk Grove, CA |
|------|------|

| | |
|---|---|
| 2007 – 2024 | Instructor, American Association of Suicidology, Washington, D.C. |
| 2005 – 2015 | Suicide Prevention Coordinator, Statewide Mental Health Program, California Correctional Health Care Services, Elk Grove, CA |
| 2001 – 2005 | Psychologist, Folsom State Prison & California Medical Facility, California Department of Corrections & Rehabilitation |
| 2003 – 2009 | Assistant Clinical Professor, Department of Internal Medicine, UC Davis Medical School, Sacramento, CA |
| 1999 – 2000 | Roxane Clinical Fellow, West Coast Center for Palliative Education, UC Davis Medical Center, Sacramento, CA |
| 1999 – 2001 | Assistant Clinical Professor, Department of Psychiatry and Behavioral Sciences, UC Davis Medical School, Sacramento, CA |
| 1998 – 2001 | Clinical Psychologist, Department of Psychiatry and Behavioral Sciences, UC Davis Medical Center, Sacramento, CA |
| 1995 – 1997 | Clinical Psychologist, PTSD Clinical Team, Northern California Health Care System, Department of Veterans Affairs, Sacramento, CA |
| 1995 – 1999 | Clinical Instructor, Department of Psychiatry and Behavioral Sciences, UC Davis Medical School, Sacramento, CA |

## PUBLICATIONS & PRESENTATIONS

Google Scholar Page: https://bit.ly/2NcT9Wx

### Publications

Obegi, J.H. & **Canning, R.D.** (2022). The Cell-Front Interview Revisited. *Correctional Health Care Report,* 23(4): 81, 97-98.

Berman, A.L. & **Canning, R.D.** (2022). Proximal risk for suicide in correctional settings: A call for priority research. *Psychological Services, 19*(3), 407-412. https://doi.org/10.1037/ser0000516

**Canning, R.D.** (2017, November). Surveillance success stories: California Department of Corrections and Rehabilitation. Published online at: https://sprc.org/wp-content/uploads/2023/01/california_final.pdf

**Canning, R.D.** & Dvoskin, J.A. (2016). *Preventing Suicide in Detention and Corrections Facilities.* In J. Wooldredge & P. Smith (Eds.) The Oxford Handbook on Prisons and Imprisonment. New York: Oxford University Press. https://dx.doi.org/10.1093/oxfordhb/9780199948154.013.25

Bourgeios, J.A., **Canning, R.D.**, Suggett, K., Rahim, N. & Rossaro, L. (2006). Depressive symptoms and physical/mental functioning in IFN/RBV treatment of post-transplant recurrent HCV. *Psychosomatics,* 47(3): 254-256. https://doi.org/10.1176/appi.psy.47.3.254

Bourgeios, J.A., Rossaro, L. & **Canning, R.** (2005). Depression as co-pilot: Clinical implications of hepatitis C and interferon/ribavirin treatment. *Psychiatric Times,* 22(5).

**Canning, R.D.** (2003). A primary care approach to mental health care for HIV/hepatitis infected inmates. *Infectious Diseases in Corrections Report,* 6(1):1-4.

Leamon M.H., Gibson D.R., **Canning R.D.**, Benjamin L. (2002). Hospitalization of patients with cocaine and amphetamine use disorders from a psychiatric emergency service. *Psychiatr. Serv*., 53(11):1461-6. https://doi.org/10.1176/appi.ps.53.11.1461

**Canning, R.D.** & Stuber, M.A. (2001). *Pediatric transplantation*. In Trzepacz, P.T. & DiMartini, A. (Eds.) The Transplant Patient. New York: Cambridge University Press.

Hilty, D. M., Nesbitt, T. S., **Canning, R. D.** & Hales, R. E. (2000). Telepsychiatry for the management of a liver transplantation candidate in the primary care setting. G*en. Hosp. Psychiatry,* 22, 122-123.

Leamon, M. H., **Canning, R. D.** & Benjamin, L. (2000). The impact of amphetamine-related disorders on community psychiatric emergency services: 1993-1997. *Am.J.Addict.,* 9, 70-78.

Leamon, M. R., Servis, M. E., **Canning, R. D.** & Searles, R. C. (1999). A comparison of student evaluations and faculty peer evaluations of faculty lectures. *Acad.Med.,* 74, S22-S24.

**Canning, R. D.**, Harris, E. S. & Kelleher, K. J. (1996). Factors predicting distress among caregivers to children with chronic medical conditions. *J.Pediatr.Psychol.,* 21, 735-749.

Harris, E. S., **Canning, R. D.** & Kelleher, K. J. (1996). A comparison of measures of adjustment, symptoms, and impairment among children with chronic medical conditions. *J.Am.Acad.Child Adolesc.Psychiatry,* 35, 1025-1032.

**Canning, R. D.**, Dew, M. A. & Davidson, S. (1996). Psychological distress among caregivers to heart transplant recipients. *Soc.Sci.Med.,* 42, 599-608.

Feldman, S.S., Rosenthal, D.R., Brown, N.L. & **Canning, R.D.** (1995). Pathways to early sexual intercourse: A longitudinal study of the influence of peer status. *J.Res.Adolesc*., 5, 387-412.

Canning, E. H., **Canning, R. D.** & Boyce, W. T. (1992). Depressive symptoms and adaptive style in children with cancer. *J.Am.Acad.ChildAdolesc.Psychiatry,* 31, 1120-1124.

## **Presentations, Trainings, & Abstracts (2010 to present)**

**Canning, R.D.** and Butler, Mary. (2023, February). Suicide Risk Assessment through a Correctional Lens. Forensic Mental Health Association of California.

**Canning, R.D.** (2021, July). Suicide Risk Assessment for Jail Clinicians. Training for Adult Forensic Behavioral Health staff, Alameda County Santa Rita Jail, Dublin, CA.

**Canning, R.D.** (2021, July). Psychological Autopsies for Correctional Settings. Presented at the Corrections-Related Suicide Webinar, Global Justice Resource Center, San Luis Obispo, California.

**Canning, R.D.** (2021, June). Working with Difficult Suicidal Jail Residents. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2021, March). Suicide Risk Assessment for Jail Clinicians. Training for Jail Mental Health Team, Marin County Jail, San Rafael, California.

**Canning, R.D.** (2020, May). Suicide Risk Assessment for Jail Clinicians. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2020, January). Screening for Suicide Risk. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2019, April). Suicide Risk Assessment with Individuals Confined in Forensic and Prison Settings. Training for the Forensic Assessment Unit, Department of State Hospitals, State of California, Sacramento, CA.

**Canning, R.D.** (2018, September). History of Suicide Prevention in the California Department of Corrections and Rehabilitation. Talk presented at the Annual Suicide Summit, Statewide Mental Health Program, California Correctional Health Care Services. Folsom, California.

Horon, R. & **Canning, R.** (2017, April). Suicide Risk Assessment Prevention for Correctional Mental Health Clinicians. Workshop presented at the annual conference of the American Association of Suicidology. Phoenix, Arizona.

**Canning, R**., DiCiro, M. & Colley, J. (2016, October). Medically serious self-injury among state prison inmates. Presentation at the annual meeting of the American Academy of Psychiatry and the Law, Portland, Oregon.

**Canning, R.,** DiCiro, M. & Glenn, K. (2016, March). Medically serious self-injury in state prison: A case series. Poster presented at the annual meeting of the Forensic Mental Health Association of California, Monterey, California.

**Canning, R.D**. (2015**,** April). Suicide risk evaluation for mental health clinicians. Invited presentation, Annual Meeting of the California Psychological Association, San Diego, California.

**Canning, R.D.** & Horon, R. (2015, February). Improving suicide risk assessment with offenders: Collaboration and research to inform practice in the California Department of Corrections and Rehabilitation and the Department of State Hospitals. Presentation at the annual meeting of the Forensic Mental Health Association of California, Monterey, California.

Horon, R., **Canning, R**., McManus, T. (2014, April). Suicide Risk Assessment: Research, refinement and innovation within California prisons. Panel presentation at the annual meeting of the American Association of Suicidology, Los Angeles, California.

McDermott, B., Warburton, K., **Canning, R. &** Scott, C. (2012, October). Safety and security across the continuum of care in psychiatry. Panel presentation at the annual meeting of the American Academy of Psychiatry and the Law, Montreal, Quebec, Canada.

**Canning, R.D.** (2011, October). Suicide among the elderly. Presentation to the Communities Taking Steps: Suicide Awareness and Prevention Conference, Sacramento, California.

Berman, A. & **Canning, R.D.** (2010, July). Standardized training for suicide risk assessment in correctional settings. Talk presented to the National Commission on Correctional Health Care meeting on Correctional Mental Health, Boston, Massachusetts.

## MEMBERSHIPS

| | |
|---|---|
| 2021 – 2025 | Forensic Mental Health Association of California |
| 1997 – 2025 | Psychologists in Public Service, Division 18 of the American Psychological Association, |
| 1998 – 2023 | Society of Psychology and the Law, Division 41 of the American Psychological Association |
| 2005 – 2023 | American Association of Suicidology |
| 2013 – 2019 | Association for Psychological Science |
| 2006 – 2010 | American Association of Forensic & Correctional Psychology |

## CREDENTIALING

| | |
|---|---|
| 2006 – 2025 | California Correctional Health Care Services, Elk Grove, CA |
| 2001 – 2005 | Medical Staff, California Medical Facility, Vacaville, CA |
| 1998 – 2001 | Medical Staff, UC Davis Medical Center, Sacramento, CA |
| 1998 – 2001 | Medical Staff, Shriners' Hospital, Sacramento, CA |
| 1995 – 1997 | Medical Staff, Department of Veterans Affairs, Northern California Health Care System |

## PROFESSIONAL SERVICE

| | |
|---|---|
| 2021 – 2023 | Education Committee, Forensic Mental Health Association of California |
| 2018 – 2022 | *Ad hoc* Reviewer, *Psychological Services*, Division 18 – Psychologists in Public Service, American Psychological Association |
| 2009 – 2018 | *Ad hoc* Reviewer, American Association of Suicidology, Washington, DC |
| 2003 – 2005 | Preceptor, Second Year Medical Students, UC Davis Medical School |
| 2004 – 2005 | Chair, Department of Psychology, California Medical Facility |
| 2002 – 2005 | Instructor, Psychology Internship Program, California Medical Facility |
| 2002 – 2003 | Vice-Chair, Department of Psychology, California Medical Facility, Vacaville, CA |
| 2001 – 2003 | Bioethics Committee, California Medical Facility, Vacaville, CA |
| 2000 – 2001 | Bioethics Consultation Committee, UC Davis Medical Center, Sacramento, CA |
| 1995 – 1997 | Instructor, Psychology Internship, VA Medical Center, Martinez |
| 1998 – 2001 | *Ad hoc* reviewer, *Social Science & Medicine* and *Journal of Clinical & Consulting Psychology* |

## RESEARCH

Robert D. Canning, Ph.D., CCHP                                                    Page 8 of 8

2016                    Co-Principal Investigator, <u>Machine Learning to Forecast Self-Injury Among Prison Inmates</u>. American Foundation for Suicide Prevention, New York, NY (unfunded).

2014                    Research Training Institute, Injury Control Research Center for Suicide, University of Rochester Medical Center, Rochester, NY.

2008 – 2014             Consultant, <u>Evaluation of Suicide Risk Among Incarcerated Psychiatric Patients</u>. Vacaville Psychiatric Program, California Department of State Hospitals, Vacaville, CA., Robert Horon, Ph.D., Principal Investigator

2011 – 2012             Consultant, <u>Screening for Depression and Suicide Risk</u>. UC Davis School of Medicine, Department of Psychiatry & Behavioral Sciences, William Jarrold, PhD, Principal Investigator.

2000 – 2005             Consultant, <u>Interferon Alpha and Ribavirin Rx for Recurrent HCV in Liver Transplant Patients</u>. UC Davis Transplant Center, Lorenzo Rossarro, MD, Principal Investigator

1999 – 2000             Consultant, <u>Decreasing Distress Among Newly Diagnosed Cancer Patients</u>. UC Davis Cancer Center, Fred Meyers, MD, Principal Investigator

1998 – 2001             Medical Education Research Group, Department of Psychiatry, UC Davis Medical Center

## PUBLIC SERVICE

2021 – 2025             Member, Police Accountability Commission, City of Davis, California.

2007 – 2016             Member & Vice-Chair, Mental Health Advisory Board, Yolo County, California.