**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MARCUS ALLEN HOLMES,

Plaintiff,

v.

D. EMANUEL, et al.,

Defendants.

CASE NO. 2:24-cv-10845-SVW (SK)

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [52]; AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITHOUT PREJUDICE [53]**

## I.
## INTRODUCTION

Plaintiff Marcus Allen Holmes is a California state prisoner suing a clinical social worker, Maria Nieves, and a psychologist, Dorien Emanuel, who each provided mental healthcare to plaintiff at different times over a four-month period in 2024 while he was housed at the California State Prison-Los Angeles County (CSP-LAC). In his pro se complaint under 42 U.S.C. § 1983, plaintiff claims that defendants were deliberately indifferent to his serious suicide risk and post-traumatic stress disorder in violation of the Eighth Amendment. He also claims that after he complained about his mental health treatment, Defendant Emanuel retaliated against him by downgrading him from the most intensive outpatient treatment program at CSP-LAC to the least intensive, in violation of the First Amendment.

Defendants move for summary judgment in part on the ground that plaintiff failed to exhaust administrative remedies as mandated by the Prison

Litigation Reform Act (PLRA). Plaintiff opposes the motion and at the same time moves for summary judgment in his favor on the merits of his Eighth and First Amendment claims.[1] But exhaustion under the PLRA is mandatory, so the merits of plaintiff's claims cannot be decided unless they were properly exhausted. And here, defendants have shown that plaintiff did not exhaust available administrative remedies before suing in federal court. So to survive their summary judgment motion—let alone to win his own—plaintiff must produce evidence that those remedies were effectively incapable of use. Yet plaintiff has not carried that burden. Thus, defendants' motion for summary judgment should be granted based on administrative non-exhaustion, plaintiff's cross-motion for summary judgment should be denied for the same reason, and judgment should be entered dismissing his § 1983 claims without prejudice.

## II.

## BACKGROUND

### A. Administrative Health Care Grievance Procedures

Healthcare grievances by California state prisoners are governed by a comprehensive regulatory scheme that is distinct from the general scheme available for non-healthcare grievances. *See* Cal. Code Regs. tit. 15, §§ 3999.225–3999.237 (2024). To exhaust a healthcare grievance under those regulations, prisoners must carry it through two levels of review. §§ 3999.225(l), 3999.226(a), (g), 3999.230(h). Grievances are tracked in the Health Care Appeals and Risk Tracking System (HCARTS), which assigns each grievance its own tracking number and records pertinent details like dates of receipt, closure, appeal, or rejection. (ECF 52-2, Defendants'

[1] Defendants also seek summary judgment on the merits of plaintiff's claims, including on the basis of qualified immunity.

Statement of Uncontroverted Facts [DSUF] 173; Declaration of R. Hart [Hart Decl.] ¶¶ 4–6).[2]

At the first level, an inmate submits a CDCR 602 HC form to the Health Care Grievance Office at his institution. Cal. Code Regs. tit. 15, §§ 3999.227(b), (m). Unless clinical staff designate a grievance as expedited—requiring a response in five business days—the Grievance Office must complete its "institutional level response" within 45 business days of receipt. §§ 3999.228(i), 3999.233(b). It may exceed that 45-day default period in four circumstances: if patient, staff, or witnesses needed to resolve the grievance are unavailable; the complexity of the matter requires more research; other departments or agencies must be involved; or in a state of emergency. § 3999.233(a)(1)–(4). But nothing in the regulations requires it to acknowledge receipt, project a response date, or tell the inmate that the 45 business days have passed or that an exception applies. Still, in every case, it must return a written institutional response to the inmate.[3] §§ 3999.228(i),

[2] The material facts for exhaustion analysis are undisputed or not in genuine dispute. Facts are not genuinely disputed if the nonmoving party (1) fails to controvert the proffered undisputed fact; (2) disputes the proffered fact on grounds like foundation, vagueness, speculation, legal conclusion, or others that are immaterial at this stage or subsumed by summary judgment standards; or (3) fails to cite evidence in support of any objection. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *Tekoh v. Cnty. of Los Angeles*, 270 F. Supp. 3d 1163, 1170 n.5 (C.D. Cal. 2017); *Century 21 Real Est. LLC v. All Prof'l Realty, Inc.*, 889 F. Supp. 2d 1198, 1215 (E.D. Cal. 2012). Nor are facts genuinely disputed just because an objecting party might disagree with the other's "characterizations of the import of, or inferences properly drawn from, various pieces of evidence" that are not themselves in genuine dispute. *Sofa Ent., Inc. v. Dodger Prods., Inc.*, 782 F. Supp. 2d 898, 900 n.1 (C.D. Cal. 2010).

[3] By contrast, under the general (non-healthcare) grievance regulations now in force, the institution must acknowledge receipt of a grievance in writing and state the "calculated date for the department's response." Cal. Code Regs. tit. 15, § 3483(c). And a decision not issued within 60 calendar days is deemed "time expired," which exhausts the claim under the general grievance regulations. § 3483(g)(10), (l)(3)(B). The healthcare regulations have no parallel time-expired provision.

(j), 3999.225(v), 3999.234(b).

At the second level, an inmate dissatisfied with the institutional response can appeal to the Health Care Correspondence and Appeals Branch (HCCAB) by completing the appeal portion of the CDCR 602 HC form and submitting required grievance documents. §§ 3999.225(d), (k), 3999.229(a). That appeal is due within 35 calendar days (including time for mailing), measured from the "Date closed and mailed/delivered to" inmate as documented on the institutional response. § 3999.229(a). A late response thus does not shorten the inmate's time to appeal—the 35-day clock starts only when the institution delivers and closes its response. *Id.* The HCCAB may also accept a late appeal if good cause exists or the appeal alleges facts warranting further inquiry. § 3999.230(d)(1)–(2).

Once it receives or accepts an appeal, the HCCAB ordinarily has 60 business days—subject to the same four exceptions available to the institution—to complete its "headquarters' level review." §§ 3999.230(f), 3999.233(a)(1)–(4). Only that second-level review fully exhausts a healthcare grievance. §§ 3999.226(g), 3999.230(h). A rejected appeal cannot exhaust a grievance. *Id.* And the HCCAB may reject a grievance that does not comply with the regulations—including one that bypasses the institutional level. §§ 3999.227(m), 3999.230(c), 3999.234.

### B. Plaintiff's Relevant Health Care Grievance Record

Plaintiff's HCARTS history shows that he submitted many healthcare grievances between 2022 and 2024, and that he exhausted some through headquarters' level review—most recently with headquarters' decisions in early 2024. (DSUF 172–76; ECF 52-6, Ex. A). Indeed, at his deposition, plaintiff confirmed that he had access to the prison grievance process throughout the relevant period; his only complaint was that the institutional

responses were "always the same, deny." (ECF 52-5 at 29 [Pl. Depo. 62:5–25]). As pertinent here, the parties have identified five grievances—all submitted between May and July 2024—concerning the mental healthcare plaintiff received from Defendants Nieves or Emanuel between April and August 2024 at CSP-LAC.[4] (DSUF 117; ECF 52-5 at 7 [Pl. Depo. 18:18-22]; Hart Decl. ¶ 6; ECF 52-3 at 17–18; ECF 53 at 8–16; ECF 56 at 2).

The first grievance—Grievance 703—was submitted May 18 and received May 22, 2024. (Hart Decl. ¶ 7, Ex. B). It complained about a clinician (presumed to be Defendant Nieves) conducting "side-by-side" therapy sessions among other inmates, violating plaintiff's "rights to confidentiality." (*Id.*). Plaintiff captioned the grievance an "Emergency 602," but licensed clinical staff determined that it did not meet the criteria for expedited processing, *see* § 3999.228(b)(2), and the institutional response told him so. (ECF 52-6 at 36, 40). The second grievance—Grievance 789—was submitted June 3 and received June 6, 2024. (Hart Decl. ¶ 8, Ex. C). It complained that Defendant Nieves, while trying to meet with plaintiff's cellmate, "incit[ed] viol[e]nce" against plaintiff by having a correctional officer open his cell door while he was using the toilet. (*Id.*).

Per HCARTS, the internal due dates for institutional level responses to these two grievances were July 26 and August 9, 2024, respectively. (ECF 52-6 at 14–15). But the Grievance Office was two to four weeks late (31 and 17 days, respectively) issuing its responses. (*Id.*). Both responses, dated

[4] The parties do not dispute whether the identified grievances satisfy other exhaustion requirements such as the adequacy of notice about plaintiff's § 1983 claims. *See Jones v. Bock*, 549 U.S. 199, 218-19 (2007). Thus, even if there might be disputes about other aspects of plaintiff's care—including when Defendant Nieves stopped, and Defendant Emanuel started, treating him—they are not material to the analysis here.

August 26, 2024, found "no intervention" was required.[5] (*Id.* at 14–15, 35, 44). Still, they made clear that they were not "the final disposition on [each] health care grievance," which would need "headquarters' level review" to "exhaust[] administrative remedies." (*Id.* at 37, 46). Plaintiff, however, never appealed either response to the HCCAB within the 35-day appeal period. (Hart Decl. ¶¶ 7–8). Nor is there any evidence that he later sought leave to appeal out of time for good cause.

Meanwhile, plaintiff filed his third and fourth grievances in July 2024 after a change in the level of his outpatient care. When he arrived at CSP-LAC in April 2024, plaintiff was assigned to the Enhanced Outpatient Program (EOP), the prison's most intensive level of outpatient treatment. (DSUF 7, 13). But on July 2, 2024, plaintiff's treatment team—including Defendant Emanuel—discharged plaintiff from the EOP to the least intensive outpatient program. (DSUF 6, 160). Claiming retaliation for his earlier grievances—his May and June grievances were still pending—plaintiff submitted Grievance 962 that same day, which the Grievance Office received on July 8. (Hart Decl. ¶ 9, Ex. D). Nine days later, he submitted Grievance 1019—received on July 17, 2024—repeating his claim that Defendant Emanuel had discharged him from EOP in retaliation for "using the 602 process." (Hart Decl. ¶ 10, Ex. E).

In both July grievances, plaintiff alluded to grievances supposedly from April 2024 being "trashed" or otherwise "not [] responded to" in "retaliation." (ECF 52-6 at 57, 65). But if plaintiff meant his May and June 2024 grievances—the only relevant earlier ones shown in HCARTS—the responses to those were not yet due when he submitted the July grievances.

---

[5] An "intervention" is defined as "available administrative action or redress deemed necessary by health care staff to address an identified health care grievance." Cal. Code Regs. tit. 15, § 3999.225(q).

And no earlier grievance could have complained about his downgraded level of outpatient care, which did not happen until July 2.[6]

As it turned out, the Grievance Office issued its responses to the July grievances late as well: it closed Grievance 962 on November 18, 2024 (almost ten weeks past the September 10 due date), and Grievance 1019 on November 12 (just under eight weeks after the September 19 due date). (*Id.* at 11–12, 53, 61). It found each grievance to require "no intervention." (*Id.*). Like the August responses, both November responses told plaintiff that only headquarters' level review would exhaust his remedies. (*Id.* at 54, 62). Yet plaintiff never appealed those grievances, either. (Hart Decl. ¶¶ 9–10). In fact, when he mailed his § 1983 complaint on December 9, 2024 (ECF 1 at 7)—and even when it was docketed here on December 12—both appeal periods were still open: two weeks remained for Grievance 962 and just over a week for Grievance 1019.

The fifth (and final) grievance took a different route. On July 24, 2024—just two weeks after submitting his fourth grievance—plaintiff mailed Grievance 1109 directly to the HCCAB. (Hart Decl. ¶ 11; ECF 52-6 at 69–73). He described acts of self-harm earlier that month and alleged that his discharge from EOP was "punishment" for exercising his First Amendment rights. (ECF 52-6 at 70). He also wrote that the grievances submitted before then had "never [been] responded" to by the Grievance Office. (*Id.*). But by then, only two to three weeks had passed since plaintiff submitted his third and fourth grievances—and the response to his first was not due for another

[6] Plaintiff also complained in Grievance 962 that he was not receiving routine one-on-one sessions and that his treatment needs were still unmet—as revealed by a recent self-harm incident. (Hart Decl. ¶ 9, Ex. D). To the extent that this complaint was directed at Defendant Nieves or targeting the care he had received in EOP before July 2, the only prior grievances documented in HCARTS about such care (separate from any retaliation claim) were the two plaintiff submitted in May and June—Grievances 703 and 789. (ECF 52-6 at 14–15).

two days.

Ultimately, HCCAB rejected Grievance 1109 on August 13, 2024 because it had bypassed institutional review. (ECF 52-6 at 69; Hart Decl. ¶ 11, Ex. F). The rejection notice told plaintiff to "resubmit the health care grievance within 30 calendar days" to his institution's Grievance Office. (ECF 52-6 at 69). But there is no evidence that plaintiff did. (Hart Decl. ¶ 11). By then, Grievances 962 and 1019—raising the same complaints about his July 2 discharge from EOP—were already pending at the institutional level. So the rejection notice reinforced in writing—still four months before plaintiff sued—that exhaustion required two levels of administrative review. Yet four months later, plaintiff sued here anyway without completing headquarters' level review on any grievance concerning Defendant Nieves or Defendant Emanuel.

## III.
## DISCUSSION

Under the PLRA, "[n]o action shall be brought with respect to prison conditions" under 42 U.S.C. § 1983 "by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). That requirement is "mandatory" and "impervious to judicial discretion." *Ross v. Blake*, 578 U.S. 632, 639 (2016). The only exception permits a court "to dismiss plainly meritless claims without first addressing" exhaustion. *Perttu v. Richards*, 605 U.S. 460, 469 (2025). Indeed, exhaustion is required even if the administrative process cannot provide the specific relief the prisoner seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). The PLRA deliberately "removed the conditions that administrative remedies be 'plain, speedy, and effective' and that they satisfy minimum standards." *Ross*, 578 U.S. at 641

(citation omitted). So courts may not excuse exhaustion for equitable reasons or "special circumstances." *Id.*

To secure summary judgment for lack of administrative exhaustion, defendants must first identify those portions of the record revealing no genuine dispute "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). If defendants meet that initial burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of persuasion, though, remains with defendants. *See id.*

Plaintiff's burden of production on remedy unavailability is the same as any nonmovant's. He must go beyond the pleadings and designate specific material facts showing a genuine dispute about whether remedies were effectively available. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). He cannot meet his burden just by pointing to "a scintilla of evidence" or raising mere "metaphysical doubt" about material facts. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897–98 (9th Cir. 2021). A dispute is "material" only if it "might affect the outcome of the suit under the governing law," and "genuine" only if the evidence would let a reasonable jury find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When (as here) there are cross-motions for summary judgment, the court may consider all evidence submitted for both motions. *See Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir. 2001). But that does not mean the court must "scour the record in search of a genuine issue of triable fact" or relieve plaintiff of his

obligation "to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996). A § 1983 claim that was not properly exhausted with effectively available remedies must be dismissed without prejudice. *See McKinney v. Carey*, 311 F.3d 1198, 1199–1201 (9th Cir. 2002).

**A. Plaintiff Did Not Exhaust Available Administrative Remedies**

The PLRA "requires proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 90, 93 (2006). Thus, to properly exhaust prison remedies, a prisoner must use "all steps the prison holds out." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Here, there is no genuine dispute that administrative remedies were available to plaintiff and that he did not exhaust them through both required levels of review under the healthcare grievance procedures.

First, defendants produced plaintiff's HCARTS history and a declaration about grievance procedures from an official who oversees HCCAB. (Hart Decl. ¶ 2; ECF 52-6, Exs. A–F). That evidence shows not only that remedies were generally available but also that plaintiff used them repeatedly between 2022 and 2024. Second, the same undisputed evidence shows that plaintiff did not exhaust those remedies for the § 1983 claims here. Of his five relevant grievances, the first four (703, 789, 962, 1019) completed only institutional review, never the headquarters' level review. *See Woodford*, 548 U.S. at 90–93; *Jones*, 549 U.S. at 218–19. And the fifth (1109) was rejected by headquarters for bypassing the institutional level, so it was never exhausted at either level. §§ 3999.226(g), 3999.234.

What's more, the appeal windows for the denials of his third and fourth grievances remained open on December 9, 2024, when plaintiff

constructively filed his § 1983 complaint. (ECF 1 at 7). But exhaustion is measured as of the date the federal suit is filed. *See Saddozai v. Davis*, 35 F.4th 705, 708 (9th Cir. 2022); *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) (per curiam). If nothing else, then, plaintiff's decision to sue even when he still had time left to appeal the denials of his last two grievances confirms that his claims against Defendant Emanuel were unexhausted when he sued. *See Vaden v. Summerhill*, 449 F.3d 1047, 1051 (9th Cir. 2006) (Because a prisoner "may initiate litigation in federal court only after the administrative process ends and leaves his grievances unredressed," it "would be inconsistent with the objectives of the statute to let him submit his complaint any earlier than that.").

Against that evidence, plaintiff's insistence that he did exhaust either misreads the record or misunderstands what the PLRA requires. (ECF 53 at 3; ECF 56 at 2). Not one of the four institutional responses was a headquarters' level disposition, and each told him that only an HCCAB disposition would exhaust his remedies. And the fifth grievance was rejected—not decided—by HCCAB. Plaintiff never claims to have appealed the four institutional denials, and he never resubmitted his fifth grievance as instructed for institutional review. Any belief that he had fully exhausted—however reasonable—cannot excuse the fact that he had not. *See Ross*, 578 U.S. at 641 (Because PLRA eliminated requirement that prison remedies be "plain," prisoner's "reasonable mistake about the meaning of a prison's grievance procedures" cannot excuse mandatory exhaustion). Likewise, any view of his that further exhaustion would have been futile (perhaps because, as plaintiff claimed, the responses were "always the same, deny") cannot exempt his claims from statutory exhaustion, either. *See Booth*, 532 U.S. at 741 n.6 ("[W]e will not read futility or other exceptions into statutory

exhaustion requirements where Congress has provided otherwise.").[7]

### B. Plaintiff Has Not Shown That Administrative Remedies Were Effectively Unavailable

"An inmate need exhaust only such administrative remedies as are 'available'"—meaning the grievance procedures "are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642, 648. Unavailability of a remedy means something legally specific—the procedure to exhaust may be "officially on the books" but it is "not capable of use to obtain relief." *Id.* at 643. While recognizing that "these circumstances will not often arise," the Supreme Court identified three scenarios when an administrative remedy would be effectively incapable of use: (1) if, despite what regulations may provide, it "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) if the regulatory scheme is "so opaque that it becomes, practically speaking, incapable of use"; or (3) if "prison administrators thwart inmates from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

Plaintiff does not seriously contend that the healthcare grievance system was a simple dead end or so opaque as to be practically incapable of use. Nor could he. Nothing in the record suggests that plaintiff could not "discern or navigate" the healthcare grievance procedures. *Id.* at 644. To the contrary, he filed grievances successfully and exhausted some through

---

[7] Nor does it matter that plaintiff may have been diligent, even if unsuccessful, in his efforts to completely exhaust. For instance, plaintiff points to Grievance 671, filed in April 2025, as evidence of his continued diligence. (ECF 56 at 5, 18–21). But that grievance too was closed at the institutional level on June 11, 2025, with the same instruction to seek headquarters' level review—but it was never appealed. (ECF 52-6 at 7; ECF 56 at 18-20). Thus, it is no help to plaintiff on the exhaustion analysis. *See*, *e.g.*, *Obregon v. Napier*, 2023 WL 9327326, at *8 (D. Ariz. Sept. 1, 2023).

headquarters' level review. (ECF 52-6 at 19-21). Nor is there any evidence that either the Grievance Office or HCCAB "disclaim[ed] the capacity to consider" those grievances or "decline[d] ever to exercise" their "apparent authority" to decide them. *Id.* at 643. Quite the opposite: plaintiff obtained headquarters' level decisions on other grievances as recently as February 2024. Most pertinent here, plaintiff received a written response to each of the five grievances at issue—four institutional responses and one headquarters' rejection. That the responses were "always the same"—and not the relief plaintiff wanted—does not make the remedy a dead end or unusable. *See Booth*, 532 U.S. at 741 & n.6. That leaves the circumstance most commonly alleged: that prison administrators thwarted the inmate from through machination, misrepresentation, or intimidation.

On that score, plaintiff first asserts that an unspecified number grievances submitted in "April 2024" were "trashed," either gratuitously or in retaliation for his history of grievances. (ECF 52-6 at 57, 65; ECF 53 at 2; ECF 56 at 2). But that conclusory assertion cannot create a genuine dispute: plaintiff doesn't identify the subject of the "April 2024" grievances, the date or manner of their submission, or the basis for his belief that they were discarded rather than lost or delayed—if they existed at all. *See, e.g.*, *Draper v. Rosario*, 836 F.3d 1072, 1079–80 (9th Cir. 2016) (prisoner's "unsupported allegations" that officials impeded exhaustion held insufficient to create triable issue). Nor does he offer any reason to question the completeness of the HCARTS record, which reveals no grievance filed at CSP-LAC in April 2024.[8] Besides, plaintiff says that he copies his grievances

---

[8] The only April 2024 grievances shown in HCARTS are three that plaintiff submitted at CSP-Sacramento between April 3 and 4, 2024—before plaintiff's transfer to CSP-LAC—and each of those was logged and resolved. (ECF 52-6 at 16–18). Once at CSP-LAC, the first relevant grievances he filed were in May and June 2024—which is consistent with what he described in his July 2, 2024 grievance: that he had submitted "Two 602's on this

precisely because he fears they will be lost (ECF 52-6 at 57)—yet he has produced no copy of any April 2024 grievance bearing on his Eighth Amendment claim against Defendant Nieves. In any event, those grievances—even if destroyed—couldn't have exhausted plaintiff's First Amendment claim or his Eighth Amendment claim against Defendant Emanuel, since the events underlying both (his discharge from EOP in July and any care Emanuel provided) postdate April 2024. *See Sapp v. Kimbrell*, 623 F.3d 813, 823–24 (9th Cir. 2010).

Plaintiff's other contention—that delays in the institutional responses rendered remedies incapable of use—has record support but still falls short of establishing de facto unavailability of remedies. To be sure, the HCARTS record confirms that Grievance Office missed the 45-business-day deadline under § 3999.228(i) on all four grievances it processed. It closed the two grievances about Defendant Nieves two to four weeks late and the two retaliation grievances about Defendant Emanuel eight to ten weeks late. And plaintiff complained about these delays in the fifth grievance he (prematurely) sent to HCCAB. But the Ninth Circuit has declined to "adopt a bright-line rule that *any* delay in a prison's response to an inmate's grievance is sufficient to render administrative remedies unavailable." *Fordley v. Lizarraga*, 18 F.4th 344, 358 (9th Cir. 2021) (original emphasis); *accord Brannon v. Covarrubias*, No. 22-16728, 2024 WL 1253788, at *2 (9th Cir. Mar. 25, 2024).

Besides, "the assessment of availability is a 'pragmatic analysis,' *Munoz v. United States*, 28 F.4th 973, 975 (9th Cir. 2022), in which the court 'must apply [the effective unavailability standard] to the real-world

---

issue and one on my 1st [clinician] which have not been responded to." (ECF 52-6 at 57). Grievance 703 and Grievance 789 fit that description, and both were pending—though not yet due for response—on July 2.

workings of prison grievance systems.'" *Eaton v. Blewett*, 50 F.4th 1240, 1245 (9th Cir. 2022) (quoting *Ross*, 578 U.S. at 643). Here, the institutional responses were late, but they each still issued before plaintiff sued—and each told him how to finish exhausting. Plaintiff doesn't claim—nor does the record suggest—that he failed to receive them. Indeed, he not only attached the response to Grievance 962 and the rejection of Grievance 1109 to his complaint (ECF 1 at 8–16), but he also testified to recalling what the institutional responses said. (ECF 52-5 at 29 [Pl. Depo. 62:16–19]).[9] What's more, the time to appeal each of the four institutional denials ran from the date each was closed and delivered, so the delay cost plaintiff no appeal time. "The obligation to exhaust" continues "as long as *some* remedy remains 'available.'" *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (original emphasis).

These facts distinguish plaintiff's case from *Andres* and *Fordley*—in which the prisons never processed the grievances at all. In *Andres*, a state court found—after an evidentiary hearing—that officials had improperly failed to process a timely grievance that went unanswered for six months before suit. 867 F.3d at 1077–79. In *Fordley*, the prison acknowledged receiving an emergency grievance three times but never logged or answered it. 18 F.4th at 353. The regulations there required a response within five working days, prohibited extensions for emergency grievances, and allowed an extension on any other grievance only on written notice to the inmate of the reason and a new response date. *Id.* at 352 n.5, 357. Under those

---

[9] The August 26 responses to Grievances 703 and 789 were mailed to plaintiff at the California Substance Abuse Treatment Facility, to which he had been temporarily transferred on August 17. (ECF 52-6 at 35, 44; DSUF 52, 116). Plaintiff does not contend that he failed to receive them or that the transfer otherwise interfered with his ability to appeal. Even if the responses had reached him late, the regulations permit the HCCAB to accept an untimely appeal for good cause.

regulations, silence past the deadline meant the process had failed—and so the remedy was held effectively unavailable. *See id.* at 357.

By contrast, when plaintiff first complained on July 2, 2024 (in Grievance 962) that his grievances had gone unanswered, neither of the two then pending was overdue—the earliest response (for Grievance 703) was not due until July 26. The same was true when he complained of delay again on July 11 and July 24 (in Grievances 1019 and 1109)—the institution's responses were not due. What's more, every relevant grievance here was logged within days of submission, assigned a due date, and answered—albeit late. And the healthcare grievance regulations treat a response issued after 45 business days differently from the way the regulations in *Fordley* treated silence after five: the institution may exceed the period on four enumerated grounds without notice to the inmate, § 3999.233(a); the inmate's time to appeal runs from the date the response is closed, whenever that is, § 3999.229(a); and a late appeal may be accepted for good cause, § 3999.230(d). Under that scheme, the passage of 45 business days does not signal that the process has failed; it signals that the inmate's next step has not yet ripened.[10]

This does not mean that the exhaustion rules reward the inmate who sues the day a deadline lapses at the expense of the inmate who waits. After all, *Fordley* declined to hold that "any delay in a prison's response" renders remedies unavailable, 18 F.4th at 358, so an inmate who sues before a response under this scheme bears the risk that the delay was one the regulations permit—and must prove (as the inmate in *Fordley* successfully did) that no response was forthcoming. The inmate who waits, on the other

[10] Nor was any grievance here an emergency. Plaintiff labeled Grievance 703 an "Emergency 602," but the regulations assign that determination to clinical staff, § 3999.228(b)(2), who found it did not qualify and told him so. (ECF 52-6 at 36). Plaintiff never challenged that determination.

hand, is not penalized for waiting—he is held only to the step the administrative response opens. And it is the prison's procedural requirements—not the PLRA or federal courts—that "define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218. What the PLRA does not allow is what plaintiff did here: receive institutional responses but never appeal; bypass the institutional level altogether; or sue in federal court while an administrative appeal period is still running. *See Brown*, 422 F.3d at 935; *Andres*, 867 F.3d at 1079. And because the available administrative remedies remained "capable of use," *Ross*, 578 U.S. at 642, when plaintiff sued in December 2024, his failure to exhaust those remedies forecloses merits review of his § 1983 claims.

## IV.
## CONCLUSION

For all these reasons, it is recommended that (1) defendants' motion for summary judgment (ECF 52) be granted solely on the ground that plaintiff failed to exhaust administrative remedies; that (2) plaintiff's cross-motion for summary judgment on the merits (ECF 53) be denied for the same reason; and that (3) judgment be entered dismissing plaintiff's § 1983 claims without prejudice.[11] *See* 28 U.S.C. § 636(b); G.O. 05-07.

DATED: October 9, 2026

STEVE KIM
United States Magistrate Judge

[11] Nothing recommended here disturbs plaintiff's rights or remedies as a class member in the *Coleman v. Newsom* litigation. But he must intervene there if he seeks relief for alleged violations of consent decrees, remedial plans, or other orders from that class action. *See Osejo v. Barajas*, 2025 WL 3034103, at *3 (E.D. Cal. Oct. 30, 2025).